**NOT FOR PUBLICATION**

**UNITED STATES BANKRUPTCY APPELLATE PANEL**
**OF THE NINTH CIRCUIT**

In re:                              )    BAP No. EC-15-1286-LFKi
                                    )    BAP No. EC-15-1292-LFKi
YOUSIF H. HALLOUM,                  )    BAP No. EC-15-1297-LFKi
                                    )    (related appeals)
                Debtor.            )
                                    )    Bk. No. 12-21477-C-7
_____)
YOUSIF H. HALLOUM; IMAN Y.          )    Adv. No. 15-02091-C
HALLOUM,                            )
                                    )
                Appellants,        )
v.                                  )
                                    )    **MEMORANDUM**[*]
KATZEN & SCHURICHT; DAVID I.        )
KATZEN; HILTON A. RYDER;            )
McCORMICK, BARSTOW LLP;             )
SCOTT KOENIG; MICHAEL G.            )
KASOLAS; MICHAEL C. ABEL;           )
SCOTT H. MCNUTT; MCNUTT LAW         )
GROUP, LLP,                         )
                                    )
                Appellees.         )
_____)

Submitted Without Oral Argument
on November 17, 2016

Filed - December 9, 2016

Appeal from the United States Bankruptcy Court
for the Eastern District of California

Honorable Christopher M. Klein, Bankruptcy Judge, Presiding
_____

Appearances:    Yousif H. Halloum and Iman Y. Halloum on brief pro
                se; Scott H. McNutt, Michael C. Abel and Thomas B.
                Rupp of McNutt Law Group LLP on brief for
                appellees Michael G. Kasolas, Chapter 7 Trustee,
                McNutt Law Group LLP, Scott H. McNutt and Michael
                C. Abel; David I. Katzen of Katzen & Schuricht and

---

[*] This disposition is not appropriate for publication.
Although it may be cited for whatever persuasive value it may
have (see Fed. R. App. P. 32.1), it has no precedential value.
See 9th Cir. BAP Rule 8024-1.

Alan Scott Koenig of ASK Law Offices on brief for appellees Scott Koenig, David I. Katzen, and Katzen & Schuricht; Scott M. Reddie of McCormick Barstow LLP on brief for appellees McCormick Barstow LLP and Hilton A. Ryder.

_____

Before: LAFFERTY, KIRSCHER, and FARIS, Bankruptcy Judges.

## INTRODUCTION

After Debtor Yousif Halloum's chapter 11[1] case was converted to chapter 7 and his discharge entered, Debtor and his non-debtor spouse, Iman Halloum ("Iman") (collectively, "Halloums"), filed a lawsuit in state court against Debtor's former bankruptcy counsel and his law firm ("Ryder Defendants"), the chapter 7 trustee and his counsel ("Trustee Defendants"), and counsel for Debtor's primary secured creditor ("Bank Group"), asserting claims for malpractice and breach of contract against the Ryder Defendants and civil conspiracy and intentional interference with prospective economic advantage against all defendants. All of the claims were predicated on defendants' conduct during the course of the bankruptcy proceeding.

After the chapter 7 trustee removed the lawsuit to the bankruptcy court, Halloums filed a motion to remand, which was denied. The Trustee Defendants and Bank Group filed motions for summary judgment. Halloums opposed the summary judgment motions, requested a continuance to complete discovery, and filed a second motion to remand ("Remand Motion"). The bankruptcy court set an

_____

[1] Unless otherwise indicated, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1532, "Rule" references are to the Federal Rules of Bankruptcy Procedure, and "Civil Rule" references are to the Federal Rules of Civil Procedure.

-2-

evidentiary hearing at which Halloums presented their case in chief. The bankruptcy court denied the Remand Motion and dismissed the claims against all of the defendants on the merits, finding that the evidence was insufficient to establish Halloums' claims. Halloums timely appealed.[2] We AFFIRM.

**FACTS**

**A.    Prepetition Events**

Debtor operated an ARCO gas station and convenience store on real property located in Lodi, California. Beginning in 2005, Community Banks of Colorado ("Community Banks"), the predecessor-in-interest to Bank Midwest, N.A. ("Bank Midwest"), made loans to Debtor that were secured by Debtor's commercial real and personal property. Debtor also had his business demand deposit (checking) account ("DDA") with Bank Midwest. The commercial loan agreement contained a cross-default provision which provided that a default in the terms of the DDA agreement constituted a default under the note and deed of trust.

In late 2010 and thereafter, Debtor overdrew the DDA. On March 20, 2011, Debtor met with representatives of Community Banks. Debtor contended that a bank representative orally agreed at that meeting that Debtor would be allowed to make an $88,000 overdraft and promised that Community Banks would convert the overdraft to an unsecured loan.

[2] The orders at issue in these consolidated appeals are: (1) the bankruptcy court's denial of plaintiffs' motion for remand or abstention and a stay of proceedings (EC-15-1286); (2) the order granting in part the Bank Group's motion for summary judgment (EC-15-1297); and (3) the order granting the chapter 7 trustee's motion for summary judgment, which also dismissed all claims against all defendants (EC-15-1292).

-3-

Community Banks came under audit by the Federal Deposit Insurance Corporation ("FDIC"). Debtor became aware of this when he received an email dated July 29, 2011, from a representative of Community Banks stating that Debtor's loan file had been selected for audit by the FDIC and requesting a copy of Debtor's 2010 tax extension form. Eventually, on October 21, 2011, the FDIC was appointed receiver for Community Banks, and Community Banks' accounts were transferred to Bank Midwest.

Around this time, Debtor defaulted under the loans by missing a loan payment, failing to pay property taxes, and overdrawing the DDA. Debtor received a letter dated October 11, 2011, from Community Banks' counsel indicating that in the bank's view, there had been an unsatisfactory banking history and noting that the DDA overdraft had increased from $88,000 as of March 18, 2011 to $190,000 as of October 11, 2011. The letter stated, in relevant part:

4. Please be advised that effective 10 days from the date of this letter, the Bank will no longer allow the DDA to be overdrawn, or honor any presentations for payment in excess of the collected balance of cleared funds in the account at the time of presentation. In addition, this is to inform you that if the cumulative total of pending overdrafts exceeds $300,000 at any point between now and October 21, 2011, provisionally presented items causing such excess will be dishonored and returned unpaid.

Debtor interpreted this paragraph as authorization for a $300,000 loan, and during the next ten days he took advantage of what he contended was Bank Midwest's accommodation to boost the overdrafts from approximately $190,000 to $297,372.49.

The October 11 letter also noted that Debtor was in material default under the commercial loan agreement for failure to make

-4-

the September 2011 installment payment, for failure to pay real property taxes, and by virtue of the cross-default provision.

On October 12, 2011, Community Banks filed a notice of default commencing foreclosure proceedings. Debtor contended that he tendered the September 2011 payment on October 13, 2011, and that the bank accepted the payment but returned it two days later, advising that the bank had already filed a notice of default. Debtor also contended that he had cured the default in the property taxes by way of a promissory note.

On January 20, 2012, a notice of trustee's sale under the trust deed was recorded. Bank Midwest also sued Halloums in San Joaquin County Superior Court to recover on the $297,372.49 overdraft. Halloums cross-complained, alleging breach of a contract to transform the overdraft into some unspecified term loan. The bank's demurrer to the cross-complaint and the trustee's sale were stayed by the filing of Debtor's bankruptcy petition.

**B.    Chapter 11 Bankruptcy Events**

Debtor filed a chapter 11 petition on January 26, 2012, in the U.S. Bankruptcy Court for the Eastern District of California. On April 23, 2012, Bank Midwest filed an adversary proceeding against Debtor seeking a judgment of nondischargeability as to the $297,372.49 overdraft, alleging fraud in Debtor's failure to disclose to Community Banks that he needed the loan to cover the overdrafts because he had lost approximately $500,000 speculating on the stock market.

Debtor was initially represented in the bankruptcy by Appellee Hilton A. Ryder, a seasoned attorney with substantial

-5-

experience representing debtors in possession in bankruptcy reorganization cases. Ryder worked with Debtor's creditors, including Bank Midwest, to formulate a consensual chapter 11 plan. Ryder filed an initial plan and disclosure statement on May 23, 2013; the bankruptcy court approved Debtor's disclosure statement on November 6, 2013. Thereafter, Debtor filed a second amended disclosure statement and plan that was set for confirmation on January 29, 2014. However, by this time Debtor's relationship with Bank Midwest had broken down to the point where the bank was not willing to endure any continuing relationship with Debtor. Also, Debtor was insisting on special default provisions in the plan to which Bank Midwest objected. The bankruptcy court concluded that the parties were at an impasse and decided to appoint a chapter 11 trustee to evaluate whether the case could reasonably move toward confirmation. Appellee Michael Kasolas ("Trustee") was appointed chapter 11 trustee.

Trustee initially believed that a consensual resolution was possible and asked the court to allow more time to confirm a plan. On January 17, 2014, Trustee emailed Ryder and indicated that Trustee would support a plan that, among other things, required Debtor to deposit $200,000 to cover accrued administrative fees, and that Debtor must waive any objection to Ryder's fees. Around this time, however, Debtor decided that Ryder's services were too expensive and took the position that Ryder had agreed to do all the work in the chapter 11 case for a flat fee of $40,000, including the filing fee. Debtor took this position despite having approved Ryder's five interim fee applications totaling well in excess of $40,000, and paying those

-6-

fees.[3]  In early February 2014, Debtor fired Ryder and hired attorney Daniel Weiss to represent him in the bankruptcy.

In light of these developments, Trustee concluded that it was hopeless to expect a confirmable plan of reorganization because Debtor could not be trusted to carry it out; thus he recommended to the bankruptcy court that the case be converted to chapter 7.  On February 12, 2014, the bankruptcy court converted the case, and Trustee was appointed chapter 7 trustee.  The bankruptcy court acknowledged the possibility that the case could be reconverted to chapter 11 should the parties reach an agreement in short order.  The next day, Debtor moved to reconvert the case to chapter 11 and instructed his new counsel to file an amended plan and disclosure statement that would include Bank Midwest's proposed default terms.  At a hearing on February 26, 2014, the bankruptcy court heard argument from all parties (including Midwest Bank, which argued that reconversion was futile because it could not trust Debtor) and denied the motion to reconvert because Debtor had not established any grounds for such relief.

**C.    Post-Conversion Bankruptcy Events**

Trustee took possession of Debtor's business.  He also

---

[3] After the case was converted, Ryder filed a fee application requesting total fees of $144,280.38, which the bankruptcy court approved over Debtor's objection.  Debtor appealed that order (BAP No. EC-14-1219-JuKuPa).  We vacated the order and remanded for additional findings.  The bankruptcy court made findings on August 25, 2015 and, on August 26, 2015, entered an Order on Remand reinstating the order approving Ryder's fees.  Debtor appealed that order (BAP No. EC-15-1291-DTaJu), and we affirmed.  Debtor appealed to the Ninth Circuit Court of Appeals (9th Cir. Case No. 16-60059).  That matter is still pending.

-7-

negotiated a settlement with Bank Midwest that allowed the business to be sold, with Bank Midwest discounting its claim and agreeing to subordinate up to $150,000 of its claim to satisfy allowed administrative expenses. The bankruptcy court approved Trustee's settlement with Bank Midwest over Debtor's objection.

Trustee eventually sold the business,[4] but not before Iman intervened and asserted her right as the non-debtor spouse to purchase the business under § 363(i). The bankruptcy court afforded her the opportunity to purchase the business despite questions about her right to do so.[5]

Ultimately, Iman was unable to complete her purchase of the business and filed a motion seeking the return of her deposit, which was granted. In the pleadings that sought the return of her security deposit, Iman alleged that Trustee interfered with her ability to obtain a fuel franchise agreement and that this prevented her from purchasing the business. At other times, including in the underlying adversary complaint, Iman or Debtor alleged that Trustee interfered with Iman's financing source and convinced the lender not to loan her money to purchase the business.

On February 13, 2015, Halloums filed a complaint in the

[4] Debtor appealed the bankruptcy court's order approving the sale to this court. The Panel dismissed the appeal as moot because the sale of the business had been completed. Debtor appealed the dismissal ruling to the Ninth Circuit. That appeal is still pending (9th Cir. Case No. 14-60086).

[5] Debtor's schedules listed the business and its assets as his separate property, and the real property records showed that the land upon which the business was located was Debtor's sole and separate property per an interspousal transfer deed.

-8-

Superior Court of California, County of San Francisco. The complaint sought redress for the loss of their business as the result of the pending bankruptcy case and named as defendants Trustee, individually and as chapter 7 trustee; Ryder; McCormick, Barstow, Sheppard, Wayte & Carruth ("McCormick Barstow"); David I. Katzen; Katzen & Schuricht; Scott H. McNutt; Michael C. Abel; McNutt Law Group; and Alan Scott Koenig. McCormick Barstow is Ryder's law firm. Defendant Katzen, a partner in defendant law firm Katzen & Schuricht, and defendant Koenig are attorneys who represented Bank Midwest. Defendants McNutt and Abel, partners in defendant law firm McNutt Law Group, are counsel who represented Trustee in the bankruptcy case.

The complaint alleged five causes of action: (1) legal malpractice against Ryder; (2) breach of contract against Ryder; (3) civil conspiracy against Ryder, McCormick Barstow, Katzen, and Katzen & Schuricht; (4) civil conspiracy against all defendants; and (5) intentional interference with prospective economic advantage against all defendants.

Trustee filed a timely notice of removal in the U.S. Bankruptcy Court for the Northern District of California. Halloums moved to remand the matter back to state court; the bankruptcy court denied the motion.[6] On May 6, 2015, the

---

[6] Halloums appealed the denial of the first remand motion to the U.S. District Court for the Northern District of California, which dismissed the appeal on grounds that the order was interlocutory. Halloums then appealed to the Ninth Circuit Court of Appeals, which dismissed the appeal for lack of jurisdiction. As discussed below, Halloums subsequently filed a second remand motion that was denied by the bankruptcy court; the order denying
(continued...)

adversary proceeding was transferred to the U.S. Bankruptcy Court for the Eastern District of California.

The Bank Group moved for summary judgment on June 2, 2015, seeking dismissal of the claims against them on grounds that (1) those claims were released by virtue of the court-approved settlement between Trustee and Bank Midwest; (2) any claim that anyone in the Bank Group interfered with Iman's prospective economic advantage as a purchaser of property from Debtor's bankruptcy estate was precluded by the order granting her motion to compel Trustee's repayment of a security deposit; and (3) nothing alleged in the complaint stated a claim against anyone in the Bank Group upon which relief could be granted in favor of Halloums, Trustee, or Debtor's estate.

Shortly thereafter, on June 11, 2015, the Trustee Defendants filed a motion for summary judgment seeking dismissal on similar grounds: (1) the preclusive effect of the order granting Iman's motion to compel Trustee's repayment of a security deposit; and (2) failure to state a claim.

Halloums filed an opposition to the Trustee Defendants' summary judgment motion asserting, among other things, that there were disputed issues of material fact.

The bankruptcy court held a status conference on July 9, 2015. The bankruptcy court noted that it had the discretion to hold an evidentiary hearing on the motions for summary judgment to determine whether there were any genuine issues of material

---

[6](...continued)
the motion is one of the orders at issue in these consolidated appeals.

fact to be litigated and proposed to do so.[7] Debtor agreed to this proposal and indicated at this hearing that he would testify at the evidentiary hearing. In addition, Debtor stated that he intended to present testimony of the agent who handled Iman's loan to purchase the business and a forensic document examiner to testify as to the signature on the retainer agreement between Debtor and Ryder.

Debtor requested additional discovery in the form of a subpoena to the FDIC examiner who had examined Community Banks. The bankruptcy court responded that it would not authorize further discovery until after the evidentiary hearing, if at all. Debtor agreed. The bankruptcy court summarized its intent as follows:

> If I am not persuaded at the end of the day on August 12 that there's a genuine issue of material fact, I will terminate the litigation. If I find there is a genuine issue of material fact, then I will focus the further litigation on the genuine issues of material fact that I see. And that will considerably

---

[7] Civil Rule 52(c), applicable in bankruptcy via Rule 7052, provides:

> If a party has been fully heard on an issue during a nonjury trial and the court finds against the party on that issue, the court may enter judgment against the party on a claim or defense that, under the controlling law, can be maintained or defeated only with a favorable finding on that issue. The court may, however, decline to render any judgment until the close of the evidence. A judgment on partial findings must be supported by findings of fact and conclusions of law as required by Rule 52(a).

See also Granite State Ins. Co. v. Smart Modular Techs., Inc., 76 F.3d 1023, 1031 (9th Cir. 1996) ("[Civil Rule 52] authorizes the court to enter judgment at any time that it can appropriately make a dispositive finding of fact on the evidence.").

-11-

narrow any further work that would have to be done.

On July 29, 2015, Halloums filed the Remand Motion, which included a request to stay the proceedings. The Bank Group opposed the Remand Motion. The bankruptcy court entered an order shortening time for the Remand Motion to be heard on August 12, 2015. At that hearing, the bankruptcy court orally denied the Remand Motion on grounds that the bankruptcy court had exclusive jurisdiction over the causes of action pleaded in the complaint, which were all based on allegations of wrongdoing during the bankruptcy case. The court memorialized the ruling in a civil minute order entered August 20, 2015, and Halloums timely appealed.

As promised at the July 9 status conference, the bankruptcy court then conducted an evidentiary hearing to allow Halloums to present all their evidence in support of their claims and to identify aspects of their case that required discovery. Debtor testified at length and was cross-examined; he offered no other witnesses. At the conclusion of Halloums' evidentiary presentation, the bankruptcy court rendered judgment on partial findings pursuant to Civil Rule 52(c).

On August 25, 2015, the bankruptcy court placed its findings of fact and conclusions of law orally on the record.[8] The bankruptcy court supplemented its findings of fact and conclusions of law in a memorandum decision, Halloum v. Ryder, et

---

[8] At the evidentiary hearing, Ryder testified regarding his fee agreement with Debtor. The August 25, 2015 oral ruling includes the bankruptcy court's findings regarding the fee agreement. As noted, the order approving Ryder's fees after remand is the subject of a separate appeal.

-12-

al. (In re Halloum), 2015 WL 5095340 (Bankr. E.D. Cal. Aug. 27, 2015). There, the bankruptcy court determined that there was no basis for liability against any of the defendants and that the claims against Trustee must be dismissed because Halloums had not sought leave from the bankruptcy court before suing Trustee in the San Francisco Superior Court.[9] On August 27, 2015, the bankruptcy court entered orders granting the motions for summary judgment in part and dismissing the claims against all defendants on the merits.[10]

Halloums filed timely notices of appeal from the bankruptcy court's orders granting in part the motions for summary judgment and dismissing the claims against all defendants on the merits.

On November 7, 2016, Halloums filed with the Panel a motion to suspend hearing and to transfer venue on grounds of bias.

**JURISDICTION**

The bankruptcy court had jurisdiction pursuant to 28 U.S.C.

---

[9] Halloums subsequently filed a motion for leave to sue the Trustee, which the bankruptcy court denied, rejecting Halloums' arguments that they were not required to obtain leave because there was no ongoing bankruptcy proceeding and because their claims against Trustee were not connected to the performance of his duties as trustee. The Panel affirmed the bankruptcy court's ruling on October 27, 2016 (BAP No. EC-15-1401-JuKuMa); Halloums filed a motion for rehearing on November 7, 2016.

[10] On August 29, 2015, the Bank Group filed a motion/ application to augment determinations and amend judgment, requesting that the bankruptcy court make findings that (1) the estate's claims against the Bank Group were released as a matter of law by way of the settlement between Trustee and Bank Midwest; and (2) the adversary complaint failed to state a claim against the Bank Group. The bankruptcy court denied that motion by order entered October 16, 2015, with the exception of clarifying that its findings and rulings with respect to the Trustee Defendants applied to the merits of the case against them.

-13-

§§ 1334 and 157(b)(2)(A). We have jurisdiction under 28 U.S.C. § 158.

## ISSUES

1.  Should the Panel grant Halloums' motion to suspend hearing and transfer venue?

2.  Did the bankruptcy court err in denying the Remand Motion?

3.  Did the bankruptcy court abuse its discretion in denying Halloums' request for additional discovery?

4.  Did the bankruptcy court err in dismissing Halloums' claims against Trustee based on the Barton doctrine?

5.  Did the bankruptcy court err in entering judgment for defendants?

## STANDARDS OF REVIEW

Preemption is a question of law which we review de novo. See MSR Expl., Ltd. v. Meridian Oil, Inc., 74 F.3d 910, 912 (9th Cir. 1996).

We review a bankruptcy court's evidentiary rulings for abuse of discretion and reverse only if any error would have been prejudicial to the appellant. Van Zandt v. Mbunda (In re Mbunda), 484 B.R. 344, 351-52 (9th Cir. BAP 2012), aff'd, 604 F. App'x 552 (9th Cir. 2015).

We review the bankruptcy court's findings of fact for clear error and its conclusions of law de novo. Carrillo v. Su (In re Su), 290 F.3d 1140, 1142 (9th Cir. 2002). A finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed."

-14-

Anderson v. City of Bessemer City, N.C., 470 U.S. 564, 573 (1985) (citation omitted). Where two permissible views of the evidence exist, the factfinder's choice between them cannot be clearly erroneous. Id. at 574. We are to give "due regard to the trial court's opportunity to judge the witnesses' credibility." Civil Rule 52(a)(6). We also give deference to inferences drawn by the trial court. Beech Aircraft Corp. v. United States, 51 F.3d 834, 838 (9th Cir. 1995).

## DISCUSSION

**A.   Preliminary Matter:   Halloums' Motion to Suspend Hearing and Transfer Venue**

As noted, on November 7, 2016, Halloums filed a motion to suspend hearing and transfer venue. Appellees McCormick Barstow and Ryder opposed the motion. For the reasons explained below, we deny all relief requested in the November 7 motion and decline Appellees' request for an order to show cause regarding sanctions.

**1.   Request to Suspend Hearing Denied; No Hearing Scheduled**

Pursuant to a motion panel's order of October 5, 2015, these appeals were submitted for disposition without oral argument on November 17, 2016. Thus, the request to suspend hearing of these appeals will be denied on the ground that oral argument was never scheduled.

**2.   Request to Transfer Appeals Denied**

Halloums request transfer of these appeals to the U.S. District Court. Specifically, they request transfer of the appeals not to the U.S. District Court for the Eastern District of California, but to another district court such as the

-15-

U.S. District Court for the Northern District of California.

Under 28 U.S.C. § 158, an appellant may elect that the appeal be heard by the U.S. District Court by doing so at the time of the filing of the notice of appeal. 28 U.S.C. § 158(c)(1)(A); see also Amended Order Continuing the BAP at ¶ 3(a) (time for election). Halloums did not elect to the have the district court hear these appeals at the time of filing the notices of appeal. While the Panel may transfer an appeal to the district court to further the interests of justice under 9th Cir. BAP R. 8005-1, transfer of these appeals to the U.S. District Court would not further the interests of justice. Furthermore, there is no statutory basis for the Panel to transfer to a different district court other than the U.S. District Court for the Eastern District of California. 28 U.S.C. § 158(a).

### 3. Appellants have not demonstrated a denial of due process.

Halloums submit that they have been denied due process of law. We disagree. Due process requires sufficient notice of a pending proceeding and the opportunity for interested parties to be heard. Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 314 (1950). If deficient process is shown, Appellants must also show resulting prejudice. Rosson v. Fitzgerald (In re Rosson), 545 F.3d 764, 776 (9th Cir. 2008). Considering the prior appeals decided by the Panel and the statements made by Halloums regarding the conduct of Appellee Ryder, there is no indication that Halloums failed to receive sufficient notice and opportunity to be heard.

**4. Request for Recusal Denied**

Halloums submit that since their trial court judge was a prior member of the Bankruptcy Appellate Panel, the Panel is unable to render an unbiased decision with respect to their appeals. Having carefully considered the motion, we disagree with appellants and deny their request for recusal of the Panel.

Recusal under 28 U.S.C. § 455(a) is appropriate where "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." Blixseth v. Yellowstone Mountain Club, LLC, 742 F.3d 1215, 1219 (9th Cir. 2014) (citation omitted).

Recusal is not appropriate in these appeals. The prior adverse rulings of the Panel are not sufficient cause for recusal. Berger v. United States, 255 U.S. 22, 31 (1921); United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986). Furthermore, there are no other competent factual bases indicating bias or influence on the Panel by Judge Klein or any rational, objective basis for concern about such issues. Judge Klein's term on the Panel ended in 2008, several years before the filing of the underlying bankruptcy case and adversary proceeding, and after his term expired Judge Klein did not participate as a pro tem BAP panel member in the disposition of any appeal filed by Appellants. See Amended Order Continuing the BAP at ¶ 5 ("[A] bankruptcy judge shall not participate in an appeal originating in a district for which the judge is appointed or designated under 28 U.S.C. § 152."). Nor is there evidence of any bias on the part of this Panel.

-17-

**B.    The bankruptcy court did not err in denying the Remand Motion.**

The bankruptcy court denied the Remand Motion because it concluded (in our view, correctly) that the causes of action pleaded in the complaint all pertained to conduct by the defendants that occurred during the bankruptcy case.  As such, the bankruptcy court concluded that the adversary proceeding was squarely within the exclusive jurisdiction of the bankruptcy court and that the Bankruptcy Code provided applicable remedies that preempted the state law causes of action detailed in Halloums' complaint.[11]  We find no error in this conclusion.

Ordinarily, a cause of action arises under federal law only when the complaint raises issues of federal law.  <u>Miles v. Okun (In re Miles)</u>, 430 F.3d 1083, 1088 (9th Cir. 2005) (citing <u>Metro. Life Ins. Co. v. Taylor</u>, 481 U.S. 58, 63 (1987)).  However, the preemptive force of some federal statutes is so strong that they completely preempt an area of state law.  <u>Id.</u>  It is settled law in this Circuit that a complaint seeking damages for a party's conduct during a bankruptcy case is within exclusive federal jurisdiction, and any allegedly competing state court action is preempted by the Bankruptcy Code.  <u>See</u> <u>MSR Expl., Ltd.</u>, 74 F.3d at 912-16 (holding that debtor's malicious prosecution claim

---

[11] The remedies delineated by the bankruptcy court were: (1) fee disgorgement for attorneys pursuant to §§ 328(c) and 329(b), (2) claim disallowance pursuant to § 502, (3) surcharge of the Trustee's bond pursuant to § 322, (4) protections for debtors during the plan confirmation process pursuant to § 1126(c)-(e), (5) protections against collusive sales pursuant to § 363(n), and (6) the bankruptcy court's inherent power to prevent an abuse of process pursuant to § 105(a).

-18-

against creditor based on creditor's actions in the bankruptcy was preempted by the Bankruptcy Code); see also In re Miles, 430 F.3d at 1086 (affirming removal and dismissal of state law tort action for damages resulting from the filing of involuntary bankruptcy petitions because § 303(i) preempts state law tort causes of action for damages predicated upon the filing of an involuntary bankruptcy petition); Gonzales v. Parks, 830 F.2d 1033, 1035-36 (9th Cir. 1987) (holding that state court was without jurisdiction to hear a claim that the filing of a bankruptcy petition constituted an abuse of process).

Halloums' only argument on appeal regarding this issue is that the bankruptcy court should have exercised its discretion to "abstain" from deciding the claims asserted in the adversary proceeding. However, based on the foregoing authorities, the bankruptcy court did not have discretion to remand.[12] The bankruptcy court correctly ruled that it had exclusive jurisdiction over the causes of action in Halloums' complaint and did not err in denying the Remand Motion.[13]

---

[12] The Remand Motion alternatively requested abstention pursuant to 28 U.S.C. § 1334. However, abstention is inapplicable to removed proceedings because "a successful removal effectively extinguishes the parallel proceeding in state court." Nilsen v. Neilson (In re Cedar Funding, Inc.), 419 B.R. 807, 820 (9th Cir. BAP 2009) (citing Sec. Farms v. Int'l Bhd. of Teamsters, 124 F.3d 999, 1010 (9th Cir. 1997)).

[13] On appeal, Halloums seem to argue that the bankruptcy court erred in ruling that they were not entitled to trial by jury. However, Halloums do not specifically address the right to a jury trial. The bankruptcy court found that Debtor had invoked bankruptcy court jurisdiction by filing his chapter 11 case, and Iman had invoked bankruptcy court jurisdiction when she moved to
(continued...)

-19-

**C. The bankruptcy court did not abuse its discretion in denying Halloums' request to conduct additional discovery.**

At the July 9, 2015 status conference, Debtor indicated that he believed Community Banks' officers had falsely told the FDIC examiner that the bank had not authorized an overdraft and that as a result the examiner ordered the bank to "terminate" the loan, which is what led to the loss of Debtor's business. Debtor requested issuance of a subpoena to the FDIC for the notes of the bank examination that led to FDIC's seizure and takeover of Community Banks in an effort to show the bank's motivation to improperly commence a foreclosure. At the evidentiary hearing, Debtor requested additional time to obtain that discovery. In its oral ruling, the bankruptcy court noted that obtaining such discovery would likely be a lengthy and expensive process because the FDIC would probably resist the disclosure of its internal notes. The court also noted that the passage of time would raise questions of causation. Ultimately, the bankruptcy court denied the request because it found that such information would be beyond the scope of discovery as not being reasonably calculated to lead to the discovery of admissible evidence. Moreover, even if relevant, the court found that such evidence would be cumulative because there was ample evidence in the record of Bank Midwest's distrust and reluctance to have any further dealing with Halloums. In re Halloum, 2015 WL 5095340, at *2.

---

[13](...continued)
enforce her rights under § 363. We discern no error in this finding. See Langenkamp v. Culp, 498 U.S. 42, 44 (1990); Hickman v. Hana (In re Hickman), 384 B.R. 832, 836-40 (9th Cir. BAP 2008).

-20-

We find no error in the bankruptcy court's ruling. The bankruptcy court may enter a judgment on partial findings even though a party has represented that it can adduce further evidence if the court determines that the evidence will have little or no probative value. EBC, Inc. v. Clark Bldg. Sys., Inc., 618 F.3d 253, 272 n.21 (3d Cir. 2010).

On appeal, Halloums argue that the subpoena request to the FDIC examiner would result in "key evidence" to prove unlawful foreclosure, but they do not present any argument or point to any evidence in the record to refute the bankruptcy court's conclusion that any evidence obtained would have no probative value. Halloums also argue that there were other discovery requests pending, citing to various documents filed in the adversary proceeding, including Halloums' opposition to Trustee's motion for summary judgment, declaration in support of that opposition, Statement of Disputed Facts, Memorandum in Support of Plaintiffs' Motion to Begin Discovery, and request for evidentiary hearing with limited discovery. Although those documents, in particular the Statement of Disputed Facts, do request additional discovery (including nonprivileged communications between defendants), Debtor did not bring any of those requests to the bankruptcy court's attention at the evidentiary hearing. Moreover, Debtor does not explain how additional discovery would be likely to uncover evidence with any probative value in light of the bankruptcy court's ultimate findings.

**D.    The bankruptcy court's dismissal of the claims against Trustee based on the <u>Barton</u> doctrine was harmless error.**

The bankruptcy court dismissed the claims against Trustee in part because Halloums had not obtained permission to sue the Trustee.  The bankruptcy court also ordered that any effort by Halloums to obtain legal relief in any court other than the bankruptcy court would constitute contempt.  As noted by the bankruptcy court, "[i]t is settled law that a trustee may be sued only with leave of the court that appointed the trustee." <u>In re Halloum</u>, 2015 WL 5095340, at *3 (citing <u>Barton v. Barbour</u>, 104 U.S. 126, 128 (1881); and <u>Beck v. Fort James Corp.</u> <u>(In re Crown Vantage, Inc.)</u>, 421 F.3d 963, 970-71 (9th Cir. 2005)).  "[A] party must first obtain leave of the bankruptcy court before it initiates an action in another forum against a bankruptcy trustee or other officer appointed by the bankruptcy court for acts done in the officer's official capacity." <u>In re Crown Vantage, Inc.</u>, 421 F.3d at 970 (citations omitted).

It is undisputed that Halloums did not obtain the bankruptcy court's consent to sue Trustee in state court and thereby violated the <u>Barton</u> doctrine.  However, the Ninth Circuit Court of Appeals has held that when a case is **removed** to the appointing bankruptcy court, "all problems under the <u>Barton</u> doctrine vanish[]."  <u>Harris v. Wittman (In re Harris)</u>, 590 F.3d 730, 742 (9th Cir. 2009).  The <u>Barton</u> doctrine denies subject matter jurisdiction to all forums **except** the appointing court; it is "a practical tool to ensure that all lawsuits that could affect the administration of the bankruptcy estate proceed either in the bankruptcy court, or with the knowledge and approval of the

-22-

bankruptcy court." Id.[14]

In light of In re Harris, dismissal on grounds of the Barton doctrine was error, but such error was harmless because, as discussed below, the bankruptcy court fully considered and properly dismissed the claims against Trustee on the merits after taking evidence on those claims.

Because we conclude that the Barton doctrine did not operate to deprive the bankruptcy court of jurisdiction to hear and determine the claims asserted, we need not address Halloums' arguments that the Barton doctrine is not a substantive bar to their action because the bankruptcy estate had been fully administered;[15] that Trustee was not being sued in his official capacity; and that the bankruptcy court erred in not examining the factors set forth in In re Crown Vantage, Inc., 421 F.3d at 976 (citing Kashani v. Fulton (In re Kashani), 190 B.R. 875, 886-87 (9th Cir. BAP 1995)).

Halloums also contend that the bankruptcy court erred in ordering that their filing of a lawsuit against Trustee in another forum would constitute contempt. Their sole argument on this point is that Iman is not a debtor, and Debtor has obtained a discharge, thus there is no automatic stay. This argument does not overcome the requirement that permission is required before suing a bankruptcy trustee in a forum other than the bankruptcy

[14] No party cited In re Harris to the bankruptcy court.

[15] Ninth Circuit authority is to the contrary. See In re Crown Vantage, Inc., 421 F.3d at 972 (the Barton doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands).

-23-

court.

**E. The bankruptcy court did not err in dismissing the adversary proceeding on the merits and entering judgment in favor of all defendants.**

The adversary complaint alleged claims for legal malpractice and breach of contract against Ryder for allegedly mishandling the chapter 11 case and charging more than was allowed by the fee agreement. The complaint also alleged two counts of civil conspiracy. The first was against the Ryder Defendants and the Bank Group for allegedly cooperating in a scheme to convert the bankruptcy case to chapter 7, delay the sale of the business, interfere with Iman's purchase of the business, and financially harm Debtor. The second conspiracy claim was against all defendants for conspiring to persuade Trustee to "abandon his neutral role and begin advocating positions and court actions that would benefit the Bank and all co-conspirators." Halloums also alleged that the conspiracy included maximizing the legal billings of Trustee's counsel while minimizing the work done for the estate and enabling all participants to financially exploit the estate for profit and harm Debtor by minimizing the funds available to pay creditors. Finally, the complaint alleged a claim for intentional interference with prospective economic advantage against all defendants. This claim alleged that Iman had secured most of the financing necessary to purchase the business and had a willing lender, but that someone acting on behalf of Trustee called the lender and "apparently" discouraged the lender from extending the loan.

At the evidentiary hearing, Debtor testified for several hours and presented documentary evidence in support of his

-24-

claims. As authorized under Civil Rule 52(c),[16] the bankruptcy court considered the testimony, evidence, and arguments presented by the parties and concluded that Halloums had failed to prove the elements of any cause of action against any of the defendants, as summarized below.[17]

**1. Breach of Contract - Ryder Defendants**

The bankruptcy court found that, contrary to Debtor's assertion that Ryder had agreed to handle the chapter 11 case for a fixed fee, the fee agreement between Ryder and Debtor was on a retainer basis calling for hourly compensation. This finding was based on the original retainer agreement, which was admitted into evidence.[18] Additionally, the bankruptcy court's order authorizing Ryder's employment called for hourly "lodestar" compensation and not a fixed fee. Debtor presented no plausible evidence to the contrary. Thus, we find no error in the bankruptcy court's findings.

---

[16] Although no party has raised the issue, the bankruptcy court was clearly within its discretion to hold an evidentiary hearing to discern any material factual disputes rather than adjudicating the motions for summary judgment as presented.

[17] The bankruptcy court disposed of the malpractice claim against the Ryder Defendants in a separate order allowing Ryder's fees as an administrative claim against the estate. As noted, that order is the subject of a separate appeal. Nevertheless, some of the issues overlap due to the conspiracy allegations; therefore, we include in our analysis the bankruptcy court's findings vis-à-vis the Ryder Defendants.

[18] The bankruptcy court rejected Debtor's contention that the signature on the retainer agreement was not Debtor's. That issue is not before us in these appeals.

-25-

## 2. Breach of Contract - Bank Midwest

Although this claim was not separately pleaded in the complaint and Bank Midwest was not named as a defendant, Debtor presented evidence and argument on this issue, which he sometimes referred to as an "unlawful foreclosure," although no trustee's sale occurred. Debtor testified that he was only three weeks behind on his mortgage payments when Community Banks commenced foreclosure proceedings. He testified that Community Banks representatives had orally promised him they would convert the overdraft to an unsecured loan but instead commenced foreclosure because of the FDIC audit. The bankruptcy court found that there was no evidence that Bank Midwest breached its contract with Debtor by commencing foreclosure when Debtor was only three weeks behind on his mortgage. There was no written agreement with Community Banks to convert the overdraft into a term loan. To the contrary, the evidence showed that Community Banks considered the overdraft to be a breach of the DDA agreement and that the overdraft constituted a default under the mortgage documents. The bankruptcy court did not err in dismissing this claim.

On appeal, Halloums present new arguments regarding their claim against Bank Midwest. First, they allege that the amounts shown in the notice of default and notice of sale were different so the foreclosure was brought improperly and in violation of state law.[19] Halloums also argue they are entitled to pursue a

---

[19] The notice of default shows a default amount of $14,521.94 and states that all sums secured by the deed of trust are due and payable. The notice of sale shows a total of $2,626,845.72 due and payable, which includes the overdraft and
(continued...)

claim against Bank Midwest under the Consumer Legal Remedies Act (Cal. Civ. Code § 1750 et seq.). Because these allegations and arguments were not made to the bankruptcy court, we will not consider them. See United Student Aid Funds, Inc. v. Wylie (In re Wylie), 349 B.R. 204, 213 (9th Cir. BAP 2006).

### 3. Civil Conspiracy - Ryder Defendants and Bank Group

The bankruptcy court found no evidence that the Ryder Defendants and the Bank Group were engaged in a conspiracy to prolong the case, inflate fees, or damage Debtor. Rather, the bankruptcy court concluded that the problems in reaching agreement were caused by distrust between the parties. As evidence of conspiracy, Debtor pointed to (a) Ryder's agreement with Bank Midwest to keep the adversary proceeding open as a "stick" to encourage plan performance; (b) Ryder's refusal to seek to equitably subordinate Bank Midwest's claim; (c) the separate classification of Bank Midwest's unsecured claim; (d) Ryder's failure to pursue approval of Debtor's proposed plan default provisions; (e) the inclusion in the plan of Bank Midwest's postpetition legal fees as an unsecured claim; (f) Ryder's delay in filing the initial chapter 11 plan; and (g) Ryder's refusal to pursue a cramdown of Bank Midwest's claim.

[19](...continued)
contractual fees. Putting aside the obvious differences in notice requirements and cure obligations in notices of default and notices of sale, there was no foreclosure. Thus, any claims based on alleged irregularities in the foreclosure process are moot.

-27-

### a. Ryder's Agreement to Keep Nondischargeability Proceeding Open

Debtor testified that Ryder tried to persuade Debtor to stipulate to a nondischargeable judgment in the bankruptcy court, while Debtor wanted Ryder to move to dismiss the complaint. Instead, Ryder sent a letter to Bank Midwest suggesting that the adversary proceeding remain open for the duration of the plan as a "stick" to encourage plan performance. Debtor believed Bank Midwest allowed Ryder to use its cash collateral for unauthorized legal fees and that Ryder's suggestion to leave the adversary proceeding open was the quid pro quo for that concession.

The bankruptcy court found, after reading the nondischargeability complaint, that it stated a cause of action that would likely lead to a trial and that Debtor did not have adequate resources to fund extensive litigation with Bank Midwest. Additionally, because the nondischargeability complaint was personal to Debtor, Ryder would have been limited in the amount of estate funds he could expend to defend the suit. Thus, the bankruptcy court found that Ryder's suggestion to keep the adversary proceeding open, but inactive, was a "perfectly rational" solution that could pave the way to a consensual plan, and not evidence of a conspiracy between Ryder and the Bank Group.

Additionally, the bankruptcy court found that the record did not support a finding that cash collateral was used for unauthorized legal fees. Although the initial cash collateral budget did not include a provision for attorney's fees, this was because the approximately $39,000 retainer would have been

-28-

sufficient to provide for payment of all fees through the end of that cash collateral budget. The bankruptcy court's findings are supported by the evidence and were not clearly erroneous.

### b. Ryder's Refusal to Move for Equitable Subordination

Debtor testified that he believed Ryder should have moved for equitable subordination of Bank Midwest's claim or filed a fraudulent transfer action against Bank Midwest. Debtor believed Bank Midwest's secured claim was inflated because it included the value of car wash equipment that had been financed by U.S. Bank. Early in the case Ryder discovered that U.S. Bank failed to properly perfect its security interest in the car wash equipment and convinced U.S. Bank not to litigate the issue. As a result of the improper perfection and the after-acquired property clause in Bank Midwest's security agreement with Debtor, Bank Midwest's blanket lien extended to the car wash equipment, thus increasing its secured claim. The bankruptcy court found that because litigating equitable subordination would have been extremely difficult and expensive, and there was no evidence of misconduct by Bank Midwest, Ryder made a reasonable decision not to pursue it, especially in light of Ryder's obligation to focus on work that appeared likely to benefit the estate. The bankruptcy court also noted that raising the equitable subordination issue would have made it more difficult to achieve the consensual plan of reorganization that would be essential to helping Debtor save his business. Thus, the bankruptcy court found that Ryder's actions were in Debtor's best interest. We see no error in this finding.

-29-

### c. Separate Classification of Bank Midwest's Unsecured Claim

Debtor testified that Ryder insisted on separately classifying the bank's unsecured claim. Debtor believed that this classification resulted in a higher priority claim and entitled Bank Midwest to a greater payment than the other general unsecured creditors. Debtor surmises that Ryder and the Bank Group conspired to do this because they were aware the case would be converted and, upon conversion, Bank Midwest would receive a greater distribution than it would otherwise be entitled to.

The bankruptcy court found no collusion or improper benefit to Bank Midwest in the separate classification of its unsecured claim. The payment terms for Bank Midwest's claim and the remaining general unsecured creditors were identical. The only difference was that the plan provided for mutual releases between Debtor and Bank Midwest as of the effective date of the plan, which meant that Bank Midwest would release its nondischargeability claim, a benefit to Debtor. Further, the classification of claims in a chapter 11 plan is not controlling after the case is converted to chapter 7. The bankruptcy court's finding was not clearly erroneous.

### d. Ryder's Failure to Pursue Bank Midwest's Acceptance of Default Plan Provisions

Debtor asserted that Ryder did not sufficiently pursue Bank Midwest's acceptance of Debtor's proposed default provisions. Bank Midwest filed a conditional non-opposition to Debtor's disclosure statement, which Debtor interpreted to mean that the bank did not object to any plan provisions.

The bankruptcy court found no merit to Debtor's assertion that Ryder should have insisted Bank Midwest accept Debtor's proposed default terms, which was premised on the notion that Bank Midwest's conditional non-opposition to the disclosure statement bound it to the plan terms. The conditional non-opposition included the following language:

> Bank Midwest's nonopposition to the Disclosure does **not** mean that Bank Midwest supports the Plan in its present form. Through counsel, Bank Midwest has informed Debtor of concerns it has about aspects of the Plan as formulated, and Bank Midwest reserves the right to vote against the Plan and to oppose confirmation if its concerns are not satisfactorily resolved.

(Emphasis in original). This language makes clear that the bank did not intend to accept the proposed plan terms. The bankruptcy court correctly found that Debtor's position was based on a misunderstanding of the difference between disclosure and confirmation issues and was not supported by the evidence.

### e. Inclusion of Bank Midwest's Postpetition Legal Fees as an Unsecured Claim

Debtor testified that Ryder permitted inclusion of Bank Midwest's postpetition legal fees in the general unsecured class when the bank was not entitled to those fees, and that doing so gave the bank control of the voting, again evidencing a conspiracy between the bank and Ryder.

The bankruptcy court correctly noted that Ryder had no choice in whether to include those fees in Bank Midwest's claim because under Travelers Casualty & Surety Co. of America v. Pacific Gas & Electric Co., 549 U.S. 443 (2007), a creditor is entitled to add contractually based postpetition attorney's fees to its proof of claim. Thus, the inclusion of those fees does

-31-

not support a conspiracy finding.

### f. Delay in Filing Plan

Debtor testified that he believed Ryder failed to file a proposed plan until 16 months after the filing of the petition to increase his fees and to delay the case for Bank Midwest's benefit.

The bankruptcy court correctly found that Ryder's delay in filing a plan of reorganization did not support any claims. The court noted that in Debtor's case, time was needed to determine expected revenue to support plan payments, that Debtor was pursuing litigation against ARCO, and that Ryder was negotiating with creditors to get agreements to plan treatment. The court noted that it had monitored the case during this time but did not order Ryder to file a plan because it was aware of these ongoing issues.

### g. Ryder's Refusal to Pursue Cramdown

Debtor testified that he believed Ryder should have pursued a cramdown of Bank Midwest's claim because there were impaired classes that would have voted to accept the plan, and that Ryder's failure to do so evidenced his conspiracy with the Bank Group to convert the case to chapter 7. The bankruptcy court found no merit to this contention, noting that it is extremely expensive to litigate confirmation of a plan of reorganization, especially if it involves a cramdown, and that Bank Midwest was a "hostile creditor with the incentive to fight." Accordingly, the bankruptcy court found that Ryder pursued the appropriate strategy by negotiating a consensual plan with Bank Midwest, which would ultimately benefit Debtor by avoiding the costs

associated with a contested confirmation hearing. This finding was not clearly erroneous.

### 4. Civil Conspiracy - All Defendants

The bankruptcy court found that there was no evidence of any agreement, either express or implied, by any or all defendants to loot the estate and destroy the business after Trustee was appointed. Rather, "[t]he tragedy of this case is - and it is a genuine tragedy because it did not have to happen - that the requisite cooperation was not forthcoming. Instead, Mr. Halloum fixated on his theory that defendant Ryder had breached a fictional fixed fee agreement and conspired with the adversary." In re Halloum, 2015 WL 5095340 at *6. The evidence supports the bankruptcy court's finding.

Debtor alleged that (a) Bank Midwest's counsel made misrepresentations to the bankruptcy court to get the settlement approved; (b) Trustee and the Bank Group conspired to "steal" funds from unsecured creditors; (c) Trustee failed to maximize the return to unsecured creditors; (d) Trustee conspired with Bank Midwest to set up default terms to end the chapter 11; (e) Trustee shut down the business in violation of his duties; and (f) Trustee changed position on conversion based on a conspiracy with the Bank Group.

### a. Alleged False Representation to Bankruptcy Court Re: Settlement Between Trustee and Bank Midwest

Debtor testified that in seeking approval of the settlement between Bank Midwest and Trustee, Trustee's counsel falsely represented that Bank Midwest's claim would be reduced by

-33-

$1 million.[20] Debtor calculated that Bank Midwest actually increased its claim by $500,000. Debtor based this calculation on his valuation of Bank Midwest's collateral (and thus its secured claim), which did not include the car wash equipment that Debtor valued at $450,000. The bankruptcy court found Debtor's valuation implausible. This finding was not clearly erroneous.

Besides Debtor's opinion, the only evidence of value presented was one page from a June 28, 2013 business appraisal, which valued the furniture, fixtures, and equipment at $110,500 as of January 26, 2012, and a copy of an email dated September 27, 2013, from Debtor to an attorney stating that the liquidation value of the car wash was $230,000. Accordingly, the bankruptcy court's finding that there was no misrepresentation by Trustee's counsel was not clearly erroneous.

### b. Trustee and Bank Group's Conspiracy to "Steal" Funds from Unsecured Creditors

Debtor contended that Bank Midwest had agreed to reduce its claim to $1.6 million and to subordinate up to $100,000 of its interest in the proceeds of the sale of the business to ensure Trustee and his professionals were paid. According to Debtor, Bank Midwest actually received $2.2 million and Trustee received $275,000. Debtor alleged that Trustee overlooked the "overpayment" to Bank Midwest as part of a conspiracy to convert

---

[20] The settlement agreement provided that Bank Midwest would have an allowed secured claim of $2,898,764 and an allowed unsecured claim of $297,372 but that if Bank Midwest received payment by August 31, 2014, it would discount the secured claim to $1,700,000 plus one-third of net sale proceeds in excess of $1.7 million.

the case and get Bank Midwest and Trustee Defendants paid at the expense of creditors.

As evidence of these agreements, Debtor points to the declaration of David Katzen in support of Bank Midwest's motion to convert and Bank Midwest's reply in support of its motion to convert. The Katzen declaration describes the terms of a previous proposal calling for the reduction of the bank's claim to $1.6 million, and the reply indicates that if the case were promptly converted, Bank Midwest would be willing to subordinate up to $100,000 for payment of a trustee's sale-related administrative expenses.

Both of these documents merely describe **proposed** settlement terms. As noted, the settlement agreement that was ultimately approved by the bankruptcy court provided that Bank Midwest would reduce its secured claim to $1.7 million plus one-third of net proceeds in excess of $1.7 million and that Bank Midwest would subordinate up to $150,000 to satisfy allowed administrative expenses. Debtor provided no evidence of the amounts actually received by Bank Midwest or Trustee.

The bankruptcy court found that this evidence did not support a conspiracy to bleed the estate at the expense of unsecured creditors and then let the case be converted. The court noted that there were legitimate reasons for conversion, primarily Debtor's unwillingness to cooperate in reaching a consensual plan, and that Debtor had been given ample warning. These findings were not clearly erroneous.

### c. Trustee's Failure to Maximize Return to Unsecured Creditors

Debtor asserted that Trustee failed to maximize the return for unsecured creditors and get a fresh start for Debtor. Debtor contended that Trustee supported conversion to protect Ryder from being sued by Debtor and was determined to put Debtor out of business at any cost. The bankruptcy court found no evidence of such motivation. To the contrary, the bankruptcy court found that the evidence showed Trustee was trying to facilitate a consensual plan and was finding obstacles on both sides, and that ultimately the intransigence of the debtor led Trustee to "throw up his hands." This finding is supported by the evidence and is not clearly erroneous.

### d. Trustee's Conspiracy to Set Up Default Terms to End the Chapter 11 Case

Debtor alleged that at an early stage in the case, Ryder knew that Bank Midwest wanted the case converted to chapter 7 and that the dispute over default terms was set up as a way to end the chapter 11 case. According to Debtor, Ryder got the Trustee on the bank's "team," and Trustee instructed Bank Midwest to prepare its own default terms that Trustee would support. The bankruptcy court correctly found no evidence of any such conspiracy.

### e. Trustee's Failure to Operate Business

Debtor believed that Trustee was required under the terms of the settlement with Bank Midwest to operate the business through

-36-

the sale date, but instead Trustee closed it down.[21] Thus, Debtor asserted that by shutting down the business Trustee failed to properly protect estate assets and creditors other than the bank and reduced the value of the business. The bankruptcy court found no wrongdoing on the part of Trustee in closing down the business, noting that it had authorized the shutdown from February 14, 2014 to July 22, 2014 because of the parties' inability to agree. The record reflects that Trustee took possession of the business and its cash on February 14, 2014 and initially decided to temporarily shut down the business. Thereafter, Trustee received inquiries from parties who were interested in purchasing the business even though it was not operating. Based on this interest, and considering the startup costs of reopening, Trustee determined that it was reasonable to sell the business without reopening. The bankruptcy court's finding that Trustee did not wrongfully close the business was not clearly erroneous.

### f. Trustee's Change of Position re: Conversion

Debtor contended that Trustee's refusal to recommend confirmation in light of Debtor's objection to Ryder's fees

---

[21] The settlement agreement provides, in relevant part:

The Trustee shall undertake (with assistance from others whom he may engage) to continue or resume operation of Debtor's business as promptly as reasonably feasible, so as to facilitate sale (or other commercially reasonable disposition) of Estate property **as a going concern if doing so appears practicable and conducive to a net recovery more favorable than conventional liquidation.**

(Emphasis added).

violated the scope of Trustee's assignment, which was to help the court evaluate Debtor's plan in light of Bank Midwest's expected opposition. The bankruptcy court rejected this contention, noting that the breakdown between Debtor and his counsel signaled to Trustee that there was no effective prospect of reorganization.

Trustee's initial status report indicated that Debtor's business operations appeared to be reasonably solid and could likely support the proposed plan payments, and that Debtor was an experienced operator who had the support of a number of other creditors. Trustee asked for a brief continuance to permit him to negotiate with the parties. Trustee initially opposed conversion, although he did warn Ryder that Debtor should not be involved in drafting a plan. Trustee subsequently changed position and supported conversion, which Debtor contended supported an inference of conspiracy with Bank Midwest and Ryder.

The bankruptcy court found that Trustee justifiably changed position because of Debtor's dispute of Ryder's legal fees. Debtor had approved five interim fee awards. Late in 2013 Debtor decided that Ryder's fees were too high. Soon thereafter, Debtor began asserting that Ryder had agreed to work on the case for a fixed fee. This fee dispute caused Trustee to conclude that it was hopeless to expect a confirmable plan of reorganization because Debtor could not be trusted to carry out his obligations under the plan. Accordingly, the bankruptcy court found no evidence of wrongdoing or collusion in the Trustee's change of position.

We find no error in any of the bankruptcy court's findings.

### 5. Intentional Interference with Prospective Economic Advantage - Trustee Defendants

Debtor testified that Iman's potential lender denied her loan request after Trustee discovered the lender's identity. Debtor thus surmised that Trustee or his representative had called the lender and discouraged it from making the loan. Debtor presented as evidence a letter dated August 2, 2014 from John Arno, the agent who arranged the financing for Iman's purchase of the business. Arno stated in the letter that as of April 22, 2014, the lender had been ready to issue a commitment subject to a satisfactory environmental report but that when the environmental engineer arrived at the premises to conduct the inspection, a security guard at the premises contacted Trustee, who in turn contacted the lender before approving the inspection.

According to the letter, the environmental report indicated that no action was required, and Arno provided the additional documentation requested by lender. Nevertheless, the lender did not issue the commitment. Arno thus concluded that something said during the conversation between Trustee and the lender caused the lender to decide not to proceed with the loan.

Also admitted into evidence as attachments to the Arno letter were a copy of a commitment letter from GCA Financial confirming the availability of $600,000 to Iman and copies of bank statements purportedly showing the availability of $550,000 in "family funds" for the purchase.

The bankruptcy court found that the more plausible reason the loan was not approved was that the amounts shown on the bank statements did not add up to the $550,000 required by the lender,

and the availability of the funds "relied on the doubtful assumption that the family members would hand over all of their funds to the plaintiffs."[22]  Noting that the Arno letter was hearsay, the bankruptcy court concluded that there was no credible evidence to support the allegations that Trustee sabotaged Iman's efforts to obtain funding to purchase the business.  This finding was not clearly erroneous.

As the bankruptcy court repeatedly noted, all of Halloums' theories of liability are based on a misunderstanding of bankruptcy law, practice, and procedure.  On appeal, Halloums have not demonstrated that any of the bankruptcy court's factual findings were clearly erroneous.  In addition to making the same arguments that were presented in the bankruptcy court, they argue on appeal that the complaint stated "plausible claims for relief" and that the settlement between Trustee and Bank Midwest and order to return Iman's deposit are not preclusive.  These arguments are not applicable because the bankruptcy court did not rule on the pleadings and because it did not rule on the preclusion issues raised by defendants.

**CONCLUSION**

For the reasons set forth above, we deny Halloums' motion to suspend hearing and transfer venue.

We find no error in the bankruptcy court's denial of the Remand Motion.  Dismissal of the claims against Trustee based on

---

[22] Some of the funds reflected on the bank statements were held at the National Bank of Abu Dhabi in United Arab Emirates Dirham currency.  The bankruptcy court found that, given current exchange rates, the total amount of family funds identified in the admitted bank statements was less than $478,000.

the Barton doctrine was harmless error.

We find no abuse of discretion in the bankruptcy court's denial of Halloums' request to conduct additional discovery, nor do we find error in the dismissal of Halloums' claims against all defendants on the merits.

Accordingly, we AFFIRM the judgment of dismissal.